(C. D. 508)

WAITT & BOND *v.* UNITED STATES

United States Customs Court, First Division

(Decided June 5, 1941)

*Strauss & Hedges; Barnes, Richardson & Colburn (Joseph Schwartz* of counsel) for the plaintiffs.

*Charles D. Lawrence,* Acting Assistant Attorney General (*Richard F. Weeks, Charles J. Miville,* and *Joseph B. Brady,* special attorneys), for the defendant.

Before BROWN and WALKER, Judges; BROWN J., concurring

WALKER, Judge: This is a suit against the United States brought at the port of New York for the recovery of customs duties claimed to have been illegally exacted upon certain importations of filler tobacco from Cuba.

Since the issue raised involves a consideration of the trade agreement made by the President of the United States with the President of the Republic of Cuba, in order that we may have a foundation for the court's opinion herein we deem it necessary and essential to have before us the act of Congress which made it possible for the President

of the United States to negotiate and enter into trade agreements which have for their purpose primarily the promotion of foreign trade. Such an act was passed by Congress and approved by the President on June 12, 1934, as section 350 of the Tariff Act of 1930. We quote therefrom the following pertinent portions:

SEC. 350 (a) * * * the President, whenever he finds as a fact that any existing duties or other import restrictions of the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States and that the purpose above declared will be promoted by the means hereinafter specified, is authorized from time to time—

(1) To enter into foreign trade agreements with foreign governments or instrumentalities thereof; and

(2) To proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign-trade agreements, as are required or appropriate to carry out any foreign-trade agreement that the President has entered into hereunder * * *. The President may at any time terminate any such proclamation in whole or in part.

Under and by virtue of the terms and conditions of this special act of Congress the President of the United States entered into a trade agreement with the Republic of Cuba by its proper officers in authority on the 24th day of August, 1934 (reported in T. D. 47232), wherein it was provided, among other things, as follows:

ARTICLE III

Articles the growth, produce, or manufacture of the Republic of Cuba, enumerated and described in Schedule II annexed hereto and made a part of this Agreement, shall, on their importation into the United States of America, be granted exclusive and preferential reductions in duties not less than the percentages specified respectively in Column 1 of the said Schedule, such percentages of reduction being applied to the lowest rates of duty, respectively, now or hereafter payable on like articles the growth, produce, or manufacture of any other foreign country.

No article the growth, produce, or manufacture of the Republic of Cuba, enumerated and described in Schedule II annexed hereto, with respect to which a rate of duty is specified in Column 2 of the said Schedule, shall in any case * * * be subject to any customs duty in excess of the rate so specified.

Every article the growth, produce, or manufacture of the Republic of Cuba which is not provided for in Article I, and which is not enumerated and described in Schedule II annexed to this agreement, shall, on importation into the United States of America, be granted an exclusive and preferential reduction in duty of not less than 20 per centum, such percentage of reduction being applied to the lowest rate of duty now or hereafter payable on the like article the growth, produce, or manufacture of any other foreign country.

Schedule II of the trade agreement, referred to above, so far as pertinent to the issues in this case, reads as follows:

SCHEDULE II

| Tariff Act of 1930 paragraph | Description of articles | Column 1 Minimum preferential reduction to Cuba | Column 2 Maximum rates of duty. Specific rates in United States dollars. |
|---|---|---|---|
| | * * * * * * * | | |
| 601 | Wrapper tobacco, and filler tobacco when mixed or packed with more than 35 per centum of wrapper tobacco, if unstemmed. | 20% | 1.50 per lb. |
| 601 | Filler tobacco, not specially provided for: | | |
| | If unstemmed | 20% | 0.175 per lb. |
| | If stemmed | 20% | 0.25 per lb. |
| 603 | Scrap tobacco | 20% | 0.175 per lb. |
| 605 | Cigars, cigarettes, cheroots of all kinds and paper cigars and cigarettes, including wrappers. | 20% | 2.25 per lb. and 12½% ad valorem. |
| | NOTE.— | | |
| | * * * * * * * | | |
| | If and when the Secretary of Agriculture of the United States gives public notice that the cigar tobacco adjustment program in the United States has been abandoned or substantially abandoned, the duties on tobacco and manufactures of tobacco imported into the United States from Cuba shall be determined as though such commodities were not enumerated and described in this Schedule; provided, however, that the rates of such duties shall not exceed those imposed on the day of the signature of this Agreement. | | |
| | * * * * * * * | | |

Article IV of the agreement provides that—

The United States of America and the Republic of Cuba agree that the notes included in Schedules I and II are hereby given force and effect as integral parts of this Agreement.

Schedule I, referred to, is not involved in this particular protest, and Schedule II, or at least that portion involved, is set forth hereinabove.

On March 16, 1936, or more than a year prior to the importation of the tobacco in issue, the Secretary of Agriculture of the United States issued the following public notice:

*Public notice that the cigar tobacco adjustment program in the United States has been substantially abandoned*

For the purposes of Item Four, Paragraph 605, Schedule II, of the existing trade agreement between the United States and Cuba, signed August 24, 1934, formal public notice is hereby given as of 10 p. m., Eastern Standard Time, Monday, March 16, 1936, to the effect that the cigar tobacco adjustment program in the United States has been substantially abandoned.

In witness whereof I have hereunto set my hand and caused the official seal of the Department of Agriculture to be affixed in the city of Washington this 16th day of March 1936.

HENRY A. WALLACE,
*Secretary of Agriculture.*

The foregoing notice was published in the weekly pamphlets and bound volumes of TREASURY DECISIONS as part of T. D. 48225

Prior to the effective date of the Cuban Trade Agreement and under and by virtue of the terms of the Tariff Act of 1930 the following paragraph had to do with and covered the rates of duty imposed on filler tobacco imported into the United States from Cuba or other countries:

PAR. 601. Wrapper tobacco, and filler tobacco when mixed or packed with more than 35 per centum of wrapper toacco, and all leaf tobacco the product of two or more countries or dependencies when mixed or packed together, if unstemmed, $2.27½ per pound; if stemmed, $2.92½ per pound; filler tobacco not specially provided for, if unstemmed, 35 cents per pound; if stemmed, 50 cents per pound.

For an intelligent discussion of the issues here involved the above matters are imperative and necessary.

The imported merchandise the subject of the above-entitled case consists of filler tobacco, stemmed and unstemmed, imported from Cuba through the port of New York during the months of September, October, and November, 1937, and was assessed for duty by the collector of customs under the provisions of paragraph 601, *supra*, as "filler tobacco, not specially provided for" at the rate of 35 cents per pound for the unstemmed and 50 cents per pound for the stemmed tobacco. A reduction of 20 per centum from the above rates was allowed by the collector under the provisions of paragraph three of article III of the Cuban Trade Agreement, *supra*.

Against the assessment of the collector hereinabove mentioned the importer filed a protest claiming that the unstemmed tobacco should have been assessed with duty at the rate of 17½ cents per pound and the stemmed tobacco at 25 cents per pound under said paragraph 601 of the Tariff Act of 1930 as amended by the said Cuban Trade Agreement under article III, schedule II, column 2 thereof.

The situation presented for decision is simply as follows: The President of the United States of America and the President of the Republic of Cuba entered into an agreement the specific purpose of which was expressed in the preamble thereof to the effect that the parties were—

desirous of strengthening the traditional bonds of friendship and commerce between their respective countries by maintaining as the basis for their commercial relations the granting of reciprocal preferential treatment, in continuation of the policy adopted in the Convention of Commercial Reciprocity of 1902 between the two countries

and took into consideration—

that changed conditions have rendered it necessary to modify the provisions of that Convention * * *.

In accordance with the declared purpose as set forth in the preamble the parties agreed, in effect, that the rates provided in paragraph 601 of the Tariff Act of 1930 on filler tobacco, namely 35 cents per pound if

unstemmed, and 50 cents per pound if stemmed, should be reduced by 50 per centum to 17½ cents per pound for the unstemmed and 25 cents per pound for the stemmed. However, it plainly appears that it was the purpose of the parties that such reduction should be in effect only during the time the cigar tobacco adjustment program in the United States had not been abandoned or substantially abandoned, and the necessary machinery to secure the carrying out of this purpose was incorporated in the note following the tobacco provisions in schedule II, which note was, by virtue of article IV, given the force and effect of an integral part of the agreement.

The method chosen by the parties to secure the termination of the reduced rates was a provision which should automatically operate upon the happening of a certain event, i. e., the giving of public notice by the Secretary of Agriculture that the cigar tobacco adjustment program in the United States had been abandoned or substantially abandoned. It is manifest that everything done by the Secretary of Agriculture was done in strict accordance with the law, and as to this no question is raised.

It is, however, seriously urged by plaintiff that by the agreement, and particularly the section thereof that has to do with the Secretary of Agriculture of the United States giving public notice that the cigar tobacco adjustment program in the United States had been abandoned or substantially abandoned, there was delegated to the Secretary of Agriculture powers and duties which only the President of the United States might properly or lawfully exercise or perform.

Plaintiff in the instant case contends it is entitled to the benefits given under the trade agreement, conceding for that purpose that the provisions hereinbefore quoted affecting paragraph 601 of the tariff act were entirely valid, a position most natural to take since by reason of that section of the agreement it reaps the benefit of the reductions in rates of duty, but boldly does an about-face and endeavors to maintain that that part of the agreement specifically stated to be an integral part thereof, to wit, the note included following the tobacco provisions, was invalid. We are satisfied that plaintiff's position is at law untenable and that it must take the chaff with the wheat. The two provisions, the one granting reductions in rates of duty and the other providing for the termination of such reductions, must stand or fall together, since they were interdependent, and it was clearly the intent of the parties to the agreement that this should be so. The universal rules as to the inseverability of entire contracts, and of dependent provisions of statutes, are too well known to require any citation, and the application of those rules to trade agreements, when considered either as contracts or as the law of the land, is obvious.

Plaintiff points out that under section 350 of the Tariff Act, *supra*, only the President of the United States may terminate foreign trade agreements, and complains that on the facts in the case at bar the rates of duty on Cuban tobacco and tobacco products established by the Cuban Trade Agreement were terminated, not by the President, but by an act of the Secretary of Agriculture. As hereinbefore stated, it is obvious that both parties to the agreement intended that the reduced rates of duty provided for tobacco and tobacco products should be in effect only during the time the cigar tobacco adjustment program in the United States had not been abandoned or substantially abandoned, and hence provided in the agreement itself for the termination of the reduced rates upon the abandonment or substantial abandonment of that program, which should be signalized by the giving of notice to that effect by the Secretary of Agriculture of the United States. By virtue of his office the Secretary of Agriculture of the United States would naturally be best informed as to the status of the cigar tobacco adjustment program in the United States, and best able to determine when such program had been abandoned or substantially abandoned. The act of the Secretary in giving the public notice involved did not, of itself, terminate the tobacco and tobacco products provisions of the agreement; that happening merely was the contingency provided for by the parties upon which *they* agreed such provisions should terminate. In that sense, so far as the United States is concerned, the President himself, as one of the parties, terminated the agreement.

For the foregoing reasons the protest at bar is overruled and judgment will issue in favor of the defendant.

### CONCURRING OPINION

BROWN, Judge: I concur in the conclusion reached, for if the writer's reasoning in *J. W. Hampton, Jr. & Co.* v *United States* 49 Treas. Dec. 593 and 616 is applicable to this plan, the result is the same.